

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:MWG
F. #2020R00680

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 7, 2021

<u>By ECF</u>

The Honorable Eric R. Komitee
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Terique Hines
>       <u>Criminal Docket No. 20-416 (EK)</u>

Dear Judge Komitee:

      The government respectfully submits this letter in advance of the sentencing of the defendant Terique Hines, which is currently scheduled for April 21, 2021 at 10:30 a.m. On October 28, 2020, the defendant pleaded guilty to a two-count information charging one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1), pursuant to a plea agreement with the government.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the range of 37 to 46 months' imprisonment, which is consistent with the plea agreement's estimate of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range.

I.      <u>Background</u>

    A.     <u>The Offense Conduct</u>

      The crimes of conviction relate to two separate incidents: the defendant's possession of a firearm and large capacity magazine in July 2019, and the defendant's possession of 9mm ammunition in June 2020.

      1.     <u>The Defendant's Possession of a Firearm in July 2019</u>

      Count One of the Information arises out of a shooting in the Canarsie neighborhood of Brooklyn, New York on July 30, 2019.  At approximately 1:55 a.m., the defendant and another individual were sitting in the defendant's vehicle, a Black 2016 Jeep

Grand Cherokee with New Jersey license plate S20LDZ (the "Vehicle"), when an unknown individual pulled alongside the Vehicle and fired multiple gunshots at the passenger's side. The defendant, who was in the driver's seat, sped away until he was pulled over by New York City Police Department ("NYPD") officers several blocks away.  See Presentence Investigation Report ("PSR") ¶¶ 3-4.

The defendant informed the officers that the passenger had been shot, and that he was driving to the hospital.  Upon further investigation at the scene, it appeared that the passenger had not actually been shot; instead, one of the bullets had hit the passenger seat, and a piece of the seat struck the passenger on his right buttock.  After determining that the passenger had not been shot, the defendant and the passenger agreed to make statements concerning the shooting at the 69th Precinct.  See PSR ¶ 4.  At the precinct, after waiving his Miranda rights, the defendant stated, in relevant part, that he owned the Vehicle (although it was registered in his girlfriend's name), and that he and the passenger were sitting in the Vehicle when an unknown vehicle pulled alongside them and fired multiple shots before speeding away.  See PSR ¶ 5.

After interviewing the defendant, NYPD officers conducted an inventory search of the Vehicle, which had been seized as evidence of the shooting, at the precinct pursuant to standard NYPD procedures.  During the inventory search, an NYPD officer found one round of ammunition, a loaded 9mm Glock 19 firearm bearing serial number HA464 US (the "Firearm"), and a high-capacity magazine capable of holding thirty-three rounds of ammunition (the "Magazine") inside storage compartments of the trunk.  See PSR ¶ 6.  As discussed below, the Firearm and Magazine resemble a firearm that the defendant brandished in a music video about killing members of the Folk Nation street gang.

On August 12, 2020, the Office of Chief Medical Examiner for the City of New York (the "OCME") compared DNA swabs recovered from the Firearm to the defendant's DNA and determined that the defendant was a contributor to three different DNA swabs recovered from the Firearm.  See PSR ¶ 8.

Ballistics evidence ties the Firearm to an unsolved shooting in April 2019 and an unsolved homicide in August 2016—both in Brooklyn, New York—although the government does not have any additional evidence connecting the defendant to those crimes at this time.  See PSR ¶ 9.

2.    The Defendant's Possession of Ammunition in June 2020

Count Two of the Information arises out of a reckless driving incident in Canarsie, after which NYPD officers found one round of 9mm ammunition in the defendant's Vehicle (the same Vehicle described above), on June 13, 2020.  On that date, NYPD officers observed the defendant's Vehicle double-parked with the engine running near the intersection of East 82nd Street and Flatlands Avenue.  The defendant was seated in the driver's seat, and another individual was seated in the front passenger's seat.  One of the officers was familiar with the defendant from the neighborhood and recognized him in the

Vehicle. Once the officer asked the defendant for his driver's license, the defendant sped away and drove through several red lights and stop signs without stopping. See PSR ¶ 10.

The officers pursued the Vehicle by car for several blocks before they lost it. As the officers were familiar with the defendant's address, they decided to drive by the defendant's house, which was nearby. As the officers were driving southwest on Avenue M, they observed the Vehicle parked in the middle of an alleyway in between East 84th Street and East 83th Street. When the officers approached the Vehicle, they saw that the driver's side door was open, the keys were in the ignition, and the engine was running. See PSR ¶ 10.

Because the Vehicle was blocking the flow of traffic in the alley, the officers arranged to have the Vehicle towed. When they were informed that a tow truck would not arrive for several hours, one of the officers entered the Vehicle and drove it back to the 69th Precinct himself. At the precinct, the officers conducted an inventory search of the Vehicle pursuant to standard NYPD procedure. During the search, the officers recovered one 9mm round of ammunition from a compartment underneath a mat near the driver's seat of the Vehicle. See PSR ¶ 10.

B.     The Defendant's History and Characteristics

1.     The Defendant's History of Gang-Related Provocation
Using the Firearm Found in July 2019

The defendant appears in music videos posted to YouTube and other platforms, in which he raps under the name "Young Costamado," and posts frequently to social media platforms. It is apparent from these music videos and social media postings that the defendant associates with sets of the Crips gang.

For instance, as described in the PSR, the defendant features prominently in a music video posted to YouTube on November 8, 2018, titled "Folk in the Trunk Pt 2," a provocative rap song about killing members of the Folk Nation and specifically the Gangster Disciples, a set of the Folk Nation. The defendant raps that he "got a Folk in my trunk," referring to a dead member of the Folk Nation in the trunk of his vehicle, calls out members of the Folk Nation by name, and uses incendiary lyrics such as: "If I slide, homicide, no leg shots, aim for the head first." The defendant also refers to himself as "GDK," which means "Gangster Disciple Killer." See https://www.youtube.com/watch?v=IOjHyIgJg1Q; PSR ¶ 7[1]

Notably, throughout this video, the defendant is brandishing a Glock-style firearm with a high-capacity magazine similar to the Firearm and Magazine found in his

---

[1] This video is also available for the Court's review.

Vehicle in July 2019.  See PSR ¶ 7.  The following three photographs are still images of the defendant holding a firearm in the music video:

 



And the following is a photograph of the Firearm and Magazine found in the defendant's vehicle in July 2019:



This type of firearm—a Glock-style handgun with a high-capacity magazine—is extremely uncommon in New York City.  See PSR ¶ 7.  Accordingly, there is reason to believe that the firearm that the defendant brandished in his November 2018 music video is the same Firearm found in his trunk in July 2019.

2.      The Defendant's Criminal History

As noted in the PSR, the defendant has an extensive criminal history including prior convictions for possession of a firearm (in 2013) and identity theft, larceny and forgery (in 2016).  See PSR ¶¶ 29-35.  Moreover, the defendant committed the instant offenses while under a three-year conditional discharge sentence imposed in 2017.  See PSR ¶¶ 33, 37.  Accordingly, the defendant is in Criminal History Category V.  PSR ¶ 38.

II.     Sentencing Guidelines

The Guidelines Offense Level, as calculated in the PSR, and to which the defendant stipulated in the plea agreement, is as follows:

| | |
|---|---|
| Base Offense Level (§ 2K2.1(a)(4)(B)) | 24 |
| Less:  Timely Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total: | 17 |

PSR ¶¶ 16-27.  Due to the defendant's criminal history, including the fact that he committed the instant offenses while subject to a three-year conditional discharge, the defendant is in Criminal History Category V.  PSR ¶¶ 36-38.  Accordingly, the applicable Guidelines range is 46 to 57 months' imprisonment.  PSR ¶ 79.

The government's estimate of the applicable Guidelines range in the plea agreement differs from the Guidelines calculation in the PSR because the government overlooked the fact that the defendant committed the instant offenses while subject to a three-year conditional discharge.  See PSR ¶¶ 33, 37.  For this reason, the plea agreement's estimate of the applicable Guidelines range was 37 to 46 months' imprisonment.

III.    A Sentence of 37 to 46 Months' Imprisonment Is Warranted

The government respectfully requests that the Court impose a sentence of 37 to 46 months' imprisonment, consistent with the plea agreement's estimate of the applicable Guidelines range.  Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's offense and to achieve the other purposes of sentencing.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").  Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing

statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." Id. at 354.

Here, the nature and circumstances of the offense—possession of a loaded firearm by a convicted felon—is undoubtedly serious. As the Second Circuit has noted, "[t]he risk of violent use posed by a convicted felon's possession of firearms is significant." United States v. Dillard, 214 F.3d 88, 94 (2d Cir. 2000); see 18 U.S.C. § 3553(a)(1). In this case, in particular, it appears that the defendant used the Firearm and Magazine recovered in his car to threaten rival gang members in a music video. And the defendant's more recent possession of a 9mm round of ammunition in 2020 further demonstrates that he poses a present and continuing danger to the community.

Moreover, the need for specific and general deterrence weighs in favor of a serious sentence in this case. The defendant is in Criminal History Category V. In the past decade, the defendant has been convicted of three felony offenses, including criminal possession of stolen property, attempted possession of a firearm and identity theft. The defendant's possession of a loaded firearm in July 2019 and ammunition in June 2020 establish that the defendant has not rehabilitated himself from the criminal conduct that characterizes his past. The punishments imposed in the past—ranging from probationary sentences to a sentence of five years' imprisonment that was suspended after nine months, see PSR ¶ 33—have had no deterrent effect on the defendant's behavior. See 18 U.S.C. § 3553(a)(2)(B); United States v. Fairclough, 439 F.3d 76, 80 (2d Cir. 2006) ("[The defendant's] repeated convictions and lenient treatment by state courts support the District Court's finding that he was prone to recidivism.").

A serious sentence of imprisonment would also account for the history and characteristics of the defendant. As noted above, the instant offense conduct represents part of a consistent pattern of criminal activity warranting a serious sentence. See 18 U.S.C. § 3553(a)(1).

IV.     <u>Conclusion</u>

   For the foregoing reasons, the government respectfully submits that a sentence of 37 to 46 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

        Respectfully submitted,

        MARK J. LESKO
        Acting United States Attorney

   By:  <u>/s/ Michael W. Gibaldi  </u>
        Michael W. Gibaldi
        Assistant U.S. Attorney
        (718) 254-6067

cc:  Clerk of the Court (EK) (by ECF)
   Karen H. Charrington, Esq. (by ECF and Email)
   Erica T. Vest, United States Probation Officer (by Email)